UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SHAYNE M. HILDRETH,   21-CR-105-LJV-JJM
　　　　　　　　　　　　　　　　　　　　DECISION & ORDER
　　　Defendant.

---

　　　The defendant, Shayne M. Hildreth, was charged in a two-count indictment with transporting and possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(1) and 2252A(a)(5)(B). Docket Item 19. The case was assigned to this Court, and on July 1, 2021, this Court referred the case to United States Magistrate Judge Jeremiah J. McCarthy for all purposes under 28 U.S.C. §§ 636(b)(1)(A) and (B). Docket Item 21.

　　　On November 9, 2021, Hildreth filed pretrial motions, including motions to suppress evidence obtained from a search of his cell phone and to suppress his statements to law enforcement. Docket Item 33. After receiving briefing from both parties and conducting an evidentiary hearing, Judge McCarthy issued a report and recommendation ("First R&R") finding that Hildreth's motion should be granted to the extent that he sought to suppress evidence obtained as a result of the search of his cell phone. Docket Item 96 at 1-9.[1] But Judge McCarthy recommended that Hildreth's statements not be suppressed. *See id.* at 10-11.

---

[1] Page numbers in docket citations refer to ECF pagination.

After the government objected to the First R&R,[2] Docket Item 105, this Court issued a decision and order denying Hildreth's motion to suppress "as to the admissibility of the contents of Hildreth's cell phone" and "reserv[ing] decision on the remainder of the motion to suppress."  Docket Item 123 at 24.  The Court "referred [the matter] back to Judge McCarthy so that Hildreth [could] renew his motions to suppress on grounds not addressed in the [First] R&R or the objections, including with respect to the legality of the traffic stop and the admissibility of Hildreth's statements to law enforcement."  *Id.* at 23-24.

Judge McCarthy then issued another report and recommendation ("Second R&R").  Docket Item 132.  After analyzing the legality of the traffic stop and Hildreth's statements, Judge McCarthy recommended that this Court deny Hildreth's motion to suppress in its entirety.  *See id.* at 5.

Hildreth objected to the Second R&R, Docket Item 137; the government responded, Docket Item 139; and Hildreth replied, Docket Item 142.  This Court heard oral argument and ordered supplemental briefing.  *See* Docket Item 144.  Both parties filed supplemental briefs, Docket Items 146 and 147, and the Court took the matter under advisement on April 16, 2024.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 USC § 636(b)(1); Fed. R. Crim. P. 59(b)(3).  The court must

---

[2] Hildreth did not object to the First R&R, but he "reserve[d] his right to file separate objections to address the illegality of the traffic stop as well as the statements [he] made subsequently" if this Court "grant[ed] the government's objections."  Docket Item 111 at 1.

review *de novo* those portions of a magistrate's recommendations to which a party objects.  28 USC § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the Second R&R; the objection, response, and reply; the materials submitted to Judge McCarthy; and the supplemental briefing submitted to this Court.  Based on that *de novo* review and for the reasons that follow, this Court accepts and adopts Judge McCarthy's Second R&R and denies Hildreth's motions to suppress.

## **FACTUAL BACKGROUND**[3]

The investigation of Hildreth began in Aurora, Missouri, on February 24, 2018, when the grandparents of a minor, M.H., called the Aurora Police Department.  Docket Item 55 at 6-9, 73-76; Docket Items 63-2 and 63-3.  After two police officers, Corporal Derrick Henson and Officer Brent Curran, arrived at the grandparents' home, the grandparents told them that M.H., who was fifteen years old, had reported being sexually abused by Hildreth.  Docket Item 55 at 74-77; Docket Item 63-2 at 1; Docket Item 63-7 at 2.  The officers then interviewed M.H., who appeared "distraught," "very shaken," and "upset."  Docket Item 55 at 12, 77.

In summary, M.H. told the officers that she had been molested by Hildreth since she was "very young"—beginning when she was about four years old—and that she had seen child pornography on his phone and laptop computer.  *Id.* at 12, 14, 77; Docket Item 63-2 at 1; Docket Item 63-3 at 1.  M.H. said that Hildreth had videos of her

---

[3] The facts in this section are largely drawn from the evidentiary hearing before Judge McCarthy.  Hildreth did not raise any factual challenges to the testimony of the officers, and both parties relied on the officers' testimony in making their arguments.

3

and several of her friends; she also said that she had found text messages on his cell phone that led her to believe that he was abusing one of her friends as well. Docket Item 55 at 12, 14, 77-78; Docket Item 63-2 at 1; Docket Item 63-3 at 1. M.H. told the officers that the last incident of abuse was two months before the interview and that Hildreth had videotaped this incident using his cell phone. Docket Item 55 at 77-78; Docket Item 63-2 at 1; Docket Item 63-3 at 1.

During the interview, the officers learned that Hildreth was on his way to Missouri from Bliss, New York, to pick up M.H.; M.H. estimated that he was about six hours away when she spoke with the officers. Docket Item 55 at 15, 82-83; Docket Item 63-2 at 1; Docket Item 63-3 at 1. Henson then stepped outside to contact Detective James Wertz and to make a child abuse report. Docket Item 55 at 15, 78-80. In the meantime, Curran overheard M.H. say that she believed the videos would still be on Hildreth's cell phone because he had the same phone for several years. *Id.* at 15-16, 19; *see also* Docket Item 63-2 at 1.

After they interviewed M.H., Henson and Curran—along with Wertz—sought to intercept Hildreth, and they set up surveillance on the grandparents' house. Docket Item 55 at 20-21, 82-83. They learned that Hildreth was driving a silver vehicle with New York license plates, *id.* at 65, 69, and they saw a vehicle matching that description noticeably slow down as it drove by the house, *id.* at 21-23, 65, 84-87. Curran followed the vehicle—without activating his emergency lights—as it pulled into the parking lot of a nearby church. *Id.* at 22-23, 88-89.

Curran then pulled in behind the vehicle so that it could not back up, activated his emergency lights, and approached Hildreth. *Id.* at 23-25, 89-90. Curran "calm[ly]"

4

asked for identification, which Hildreth provided. *Id.* at 25. At about the same time, Henson and Wertz—who were in a different car—pulled into the parking lot, activated their emergency lights, and approached the vehicle. *Id.* at 25-26, 89-90.

Curran first showed Hildreth's license to Henson and then conducted a warrant check. *Id.* at 26-27, 91. Around the same time, Henson and Wertz told Hildreth that they wanted to discuss some allegations that had been made about him. *Id.* at 26, 91. Henson asked whether Hildreth had his cell phone with him, and Hildreth said that he did. *Id.* at 92-93; Docket Item 63-3 at 1.

Hildreth agreed to step out of the vehicle to talk further. Docket Item 55 at 91-94; Docket Item 63-3 at 1. As Hildreth got out of his car, Henson noticed a cell phone in plain view in the center console. Docket Item 55 at 91-92. After Hildreth agreed to allow law enforcement to look in the car for anything illegal, Henson seized the cell phone.[4] *Id.* at 95-96. The search of the car took about fifteen minutes. *Id.* at 98.

Hildreth then agreed to follow law enforcement to the station and to answer questions, and he was placed in an interview room at approximately 10:32 p.m. *Id.* at 98-99, 102-03; Docket Item 63-2 at 1; Docket Item 63-3 at 2. A few minutes later, the officers joined Hildreth in the interview room and read him his *Miranda* warnings. Docket Item 55 at 107; Docket Item 63-6. Hildreth confirmed that he was willing to speak to the officers, was uncuffed, and signed a written waiver. Docket Item 55 at 106-07; Docket Item 63-6; Docket Item 63-5 (signed waiver). After about two hours of

---

[4] Henson also seized an item later determined to be an external power supply. Docket Item 55 at 96-97.

questioning, Hildreth asked for an attorney and the interview ended.[5]  *Id.*; Docket Item 55 at 121.

After Hildreth was released, the Aurora Police Department contacted the New York State Police and reported M.H.'s allegations.[6]  Docket Item 56 at 7-8.  Based on that report, a New York State Police Investigator, Ronald Wilson, began investigating Hildreth.  *Id.* at 7-11.  On March 3, 2018, Wilson and a colleague, Investigator William Waszkielewicz, went to Hildreth's residence to talk to him.  *Id*. at 11-12, 16, 19-21.  Both wore casual clothing, not police uniforms, but their weapons and handcuffs were visible.  *Id*. at 18-19.

The officers knocked on the door, and Hildreth asked who was there.  *Id*. at 22-24.  Wilson told Hildreth that they were with the state police and wanted to talk with him.  *Id*. at 24-25.  Hildreth invited the officers to come upstairs to talk.  *Id*. at 25.  Wilson then read Hildreth his *Miranda* rights from a laminated card, *id*. at 27-28; Docket Item 63-12 (copy of the card), and Hildreth agreed to speak with the officers, Docket Item 56 at 29.

Wilson told Hildreth that two of M.H.'s friends had made allegations against him, *id*. at 29, 31, and Hildreth admitted that he had slept next to one of them as had been alleged.  *Id*. at 31, 33.  Hildreth then said that he thought he was going to be sick, and he and the officers went into the bathroom to continue the conversation.  *Id*. at 31.

---

[5] The Court described in detail the contents of that interview in its prior decision and order.  *See* Docket Item 123 at 6-7.  Those detailed facts are not relevant to the issues presented by the objections currently before the Court, and so they are not repeated here.

[6] Investigator Wilson also had applied for a warrant to search the residence, which was executed on February 25, 2018; that search recovered, among other things, a smoke detector with a camera, pornography, multiple electronics including a laptop, and a drug called etizolam.  Docket Item 56 at 13-15.

Wilson sat on the bathtub, Hildreth sat on the toilet, and Waszkielewicz stood in the doorway. *Id.* at 32. Hildreth then said several things, including: "I've made some mistakes"; "I never intentionally wanted to hurt anyone"; "I'm sorry"; "I fucked up"; and "Yeah, they're going to find a lot of stuff on that phone." *Id*. at 34-36; Docket Item 63-11. Although Wilson observed that Hildreth appeared exhausted and became emotional as he spoke, the conversation was calm and not confrontational. Docket Item 56 at 30, 32, 36-37.

A short time later, Hildreth said, "I don't think I should say anything else without an attorney," and the interview ended. *Id*. at 37; Docket Item 63-11. Hildreth then was arrested and charged with sex abuse in the first degree and endangering the welfare of a child under New York State law.[7] Docket Item 63-13 at 5.

## DISCUSSION

I.   **LEGALITY OF THE TRAFFIC STOP**

Before law enforcement officials can make an investigatory stop, they must have a "reasonable basis to think that the person to be detained is committing or has committed a criminal offense." *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (citation and internal quotation marks omitted) ). "[T]he reasonable suspicion standard is 'not high.'" *Id.* at 136 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394

---

[7] Hildreth ultimately was indicted for and convicted of using a child in a sexual performance, conducting unlawful surveillance in the second degree, committing a criminal sexual act in the second degree, and endangering the welfare of a child. Docket Item 63-13 at 8-9; *see People v. Hildreth*, 199 A.D.3d 1366, 158 N.Y.S.3d 468 (4th Dep't 2021). He was sentenced to a total of 22 years in prison and currently is serving that term. Docket Item 63-13 at 9.

7

(1997)).  Although it "requires more than a 'hunch,'" the reasonable suspicion standard "is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts, provide a particularized and objective basis for suspecting legal wrongdoing."  *Id.* (internal citations and quotation marks omitted).

Hildreth challenges the legality of the traffic stop in Missouri.  Docket Item 137 at 10-15.  The government argues that based on M.H.'s report, the officers had reasonable suspicion to make an investigatory stop.  Docket Item 139 at 11-15.  This Court agrees with the government.

Hildreth suggests that M.H.'s report is "analogous to an anonymous tip" and argues that the officers had an "obligation to . . . corroborate" M.H.'s statements before stopping him.  *See* Docket Item 147 at 1-3.  But M.H. was not anonymous nor was she reporting hearsay or some other information of questionable reliability; on the contrary, the officers spoke with her personally and she reported abuse that she herself had experienced.  *Cf. Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (contrasting an "anonymous telephone tip" with situations in which "the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime").[8]

Moreover, as Judge McCarthy observed, this Court already has held that "there was probable cause to believe that illegal child pornography would be found on Hildreth's phone" based on the information M.H. provided.  Docket Item 132 at 2

---

[8] Indeed, there often is no "corroboration" for a minor victim's report of sexual abuse.  And requiring such corroboration would greatly impede law enforcement's ability to investigate sexual abuse cases.

(quoting Docket Item 123 at 21).  So that same report certainly satisfies the lower standard of reasonable suspicion required for the traffic stop.

For all those reasons, this Court finds that the officers had reasonable suspicion to stop Hildreth's vehicle.

## II.     THE PLAIN VIEW DOCTRINE

Because this Court finds that the traffic stop was justified, the next question is whether the warrantless seizure of Hildreth's phone was lawful.  Judge McCarthy found that based on the plain view doctrine and Hildreth's consent to the search of his car, law enforcement was authorized to seize the phone.  Docket Item 132 at 3-5.  This Court agrees.

To seize an item under the plain view doctrine, the government must demonstrate that it was "lawfully in a position from which [the officers] view[ed]" it; that "its incriminating character [was] immediately apparent"; and that the officers had "a lawful right of access" to it.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  The government argues that the police saw the phone in the car when they were talking with Hildreth and that its incriminating character was immediately apparent based on what the officers knew after talking with M.H.  Docket Item 139 at 19-21.  One of the police officers then asked Hildreth, "Do you have anything illegal in the vehicle I need to know about, guns, knives, . . . dead bodies[,] anything like that[?]"  Docket Item 55 at 96.  Hildreth said no, and the police officer asked, "[D]o you mind if I look through the vehicle just to make sure there's nothing illegal in there?"  *Id.*  Hildreth agreed to let them search.  *Id.*  The police then entered the car and seized the phone.  *Id.*

9

Hildreth first argues that "the seizure of the cell[ ]phone exceeded the scope of the consent to search" that he gave.  Docket Item 137 at 16.  More specifically, Hildreth notes that "[p]receding the request for consent to search the vehicle for illegal objects, Henson had just asked . . . Hildreth if he had anything illegal in the car such as weapons, like guns, knives, dead bodies, or illegal narcotics."  Docket Item 142 at 6.  "Looking at these statements under an objective reasonableness standard," Hildreth says, "a typical person would have understood that to mean the officer would search the vehicle for only illegal objects."  *Id.*

But there is no dispute that Hildreth gave the officers consent to enter his car, *see id.*; Docket Item 139 at 17, so they were lawfully in his car when they seized the cell phone that was in plain view.  Under the plain view doctrine, the officers therefore had a lawful right of access to the phone.

Hildreth next argues that the cell phone's incriminating character was not immediately apparent because M.H. did not give any specific description of Hildreth's cellphone.  Docket Item 137 at 19.  Therefore, Hildreth suggests, law enforcement had no way to know whether the phone they saw in Hildreth's car was the phone that M.H. said might have videos of her on it.  *See id.*

But—as the government observes—the law does not require "[n]ear certainty of the article's criminal character" to justify seizure under the plain view doctrine.  *See* Docket Item 146 at 3 (alteration in original) (quoting *United States v. Barrios-Moriera*, 872 F.2d 12, 17 (2d Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990)).  Indeed, the Second Circuit has "declined to require direct or conclusive proof, at the time of seizure, that the *particular* devices would provide

evidence of criminality." *United States v. Watson*, 2023 WL 7300618, at *6 (E.D.N.Y. Nov. 6, 2023) (citing *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017)).  And courts in this circuit have repeatedly upheld the seizure of electronic devices based on facts similar to those here.

In *Babilonia*, for example, the Second Circuit upheld the plain view seizure of cell phones when law enforcement had information that the defendant was involved in "murder-for-hire conspiracies [that] involved the use of multiple cell phones" and "used cell phones to conduct drug-related activity."  854 F.3d at 180-81.  Likewise, "[n]umerous district courts have reached a similar conclusion, requiring only that agents have probable cause to believe that the defendant used *some electronic device* in connection with the criminal conduct and that the seized device belonged to the defendant."  *Watson,* 2023 WL 7300618, at *6 (emphasis added) (citing *United States v. Chierchio*, 2022 WL 523603, at *11 (E.D.N.Y. Feb. 22, 2022) (finding that the government "did not need certainty" that "the phone it saw on [defendant's] countertop at the time of his arrest was the one it suspected was involved in criminality")).  In other words, when police have probable cause to believe that a suspect has evidence of illegal activity on his phone, they can seize a phone that belongs to the suspect without confirming that it is the suspect's only phone or that it is the specific phone thought to contain the evidence.

Based on M.H.'s statements here, the officers had probable cause to believe that Hildreth had child pornography on his cell phone.  Because the phone was in plain view in a vehicle in which Hildreth was the only occupant, they also had probable cause to

11

believe that the cell phone belonged to Hildreth.[9]  Therefore, the "incriminating character [of Hildreth's cell phone was] immediately apparent," see *Dickerson*, 508 U.S. at 375, and the officers had probable cause sufficient to seize the phone, see *Babilonia*, 854 F.3d at 180-81; *Watson*, 2023 WL 7300618, at *6; *Chierchio*, 2022 WL 523603, at *11.

For all those reasons, this Court finds that the seizure of Hildreth's phone was authorized under the plain view doctrine.

### III.  HILDRETH'S STATEMENTS

Hildreth made two sets of statements: (1) to Corporal Henson at a police station on February 24, 2018, and (2) to Investigator Wilson at Hildreth's home on March 3, 2018.  In the First R&R, Judge McCarthy found that there was no need to address the first set of statements because they were not incriminatory.  Docket Item 96 at 10.  And with respect to the second set, Judge McCarthy found that the statements were admissible because the interview at Hildreth's house was not a custodial interrogation.  *Id.* at 10-11.  Judge McCarthy made the same findings in the Second R&R.  Docket Item 132 at 5.  Hildreth objects to the finding that the interview in his home was not custodial.  Docket Item 137 at 21.

Hildreth notes "[h]e was in a small bathroom accompanied by two armed [t]roopers."  *Id.*  He says that "[a] reasonable person would not have felt at liberty to terminate the conversation and leave."  *Id.* (citation omitted).  Therefore, Hildreth

---

[9] Indeed, as explained above, see Section I, *supra*, in its prior decision and order, this Court found that there was probable cause to believe that illegal child pornography would be found on Hildreth's phone, see Docket Item 123 at 21.

12

argues, the interrogation at his home was a custodial interrogation. *See id.* at 21-22. And because he had invoked his right to counsel during a custodial interrogation just a few days before, Hildreth says that the interrogation at his home violated the rule established by *Maryland v. Shatzer*, 559 U.S. 98, 110-11 (2010)—that a person who invokes his right to counsel while under custodial interrogation cannot be subjected to a second custodial interrogation without counsel within 14 days. *See* Docket Item 127 at 21-22.

"The test for custody is an objective one: 'whether a reasonable person in [the] defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" *United States v. Newton*, 369 F.3d 659, 671 (2004) (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)). The Second Circuit has held that "[a]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (quoting *Newton*, 369 F.3d at 675); *United States v. Faux*, 828 F.3d 130, 135-36 (collecting cases). In fact, courts have repeatedly held that without some extraordinary facts establishing that the defendant was in custody, home interrogations are not custodial. *See United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (noting that home interrogations are custodial "[o]nly in extreme or unusual circumstances").

For instance, in *Unted States v. Familetti*, the defendant moved to suppress statements that he made during a search of his apartment. 878 F.3d at 56-57. Familetti had been handcuffed when the search began, but he "was not restrained when . . . two agents sat with him in his bedroom to discuss cooperation; the agents' weapons were

never drawn; and the pre-*Miranda* interview lasted at most several minutes." *Id.* at 61. The Second Circuit found that Familetti had not been subject to custodial interrogation during the interview. *Id.* at 62. Similarly, in *United States v. Faux*, the Second Circuit concluded that a defendant who was interviewed in her home during a search had not been "in custody," even though "about a dozen" agents were in her home at the time; she "was physically separated from her husband"; she "was not permitted to move freely about her home"; and she "never [was] told that she was free to leave or that she had a choice whether to respond to questioning." 828 F.3d at 136-39. In *United States v. Newton*, on the other hand, the Second Circuit found that an interrogation that took place in the defendant's home was nonetheless custodial because he was handcuffed while he was questioned. 369 F.3d at 675-77.

Here, after Hildreth said he was going to be sick, the officers moved the conversation to the bathroom. Docket Item 56 at 31. Hildreth sat on the toilet, while one of the officers stood in the doorway. *Id.* at 32. The conversation was calm and not confrontational, Hildreth was not physically restrained, and no one told him that he was not free to leave.[10] *See id.* at 30, 32, 43, 65. Although somewhat of a close call given Hildreth's physical and emotional condition, the small room, and the location of the officers, this Court finds that Hildreth's movements were "not restricted . . . to the degree

---

[10] Hildreth notes that "Trooper Wilson testified that if Hildreth had attempted to leave, he 'would have more than likely' arrested [him]." Docket Item 137 at 21-22 (citation omitted). But the relevant inquiry is not what the officer's intentions were; it is "whether a reasonable person *in [the] defendant's position* would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" *See Newton*, 369 F.3d at 671 (emphasis added) (quoting *Ali*, 68 F.3d at 1472). And there is no indication that *Hildreth* thought he was not free to leave—or, more to the point, that a reasonable person *in Hildreth's position* would have thought so—regardless of what was in Wilson's mind.

of a person under formal arrest," and that he therefore was "never 'completely at the mercy of' the agents in h[is] home."  See *Faux*, 828 F.3d at 139.

In sum, this case is more like *Familetti* and *Faux* than *Newton*.  Indeed, in *Faux*, similar to what occurred here, the officers "accompanied [the defendant] to the bathroom and stood outside the door."  828 F.3d at 133.  And while Hildreth's nausea and the fact that he made the statements in the bathroom gives the Court some pause, those facts do not tip the balance that might make the degree of restraint tantamount to a formal arrest.

For all those reasons, this Court agrees with Judge McCarthy, *see* Docket Item 132 at 5, and denies Hildreth's motion to suppress his statements.

## CONCLUSION

For the reasons stated above, this Court accepts and adopts Judge McCarthy's Second R&R, Docket Item 132, and Hildreth's motion to suppress, Docket Item 33, is DENIED.  The parties shall contact the Court to schedule a status conference to set a trial date.

SO ORDERED.


Dated:  May 15, 2024
        Buffalo, New York


                                                    */s/ Lawrence J. Vilardo*
                                                    LAWRENCE J. VILARDO
                                                    UNITED STATES DISTRICT JUDGE